## EVERITT et al. v. DUSS et al.

### (District Court, W. D. Pennsylvania. July 10, 1912.)

1. ASSOCIATIONS (§ 15*)—DISSOLUTION—HEIRS OF MEMBER—RESULTING TRUST.

Under the agreements of the members and officers of the Harmony Society, providing that the subscribers, for themselves and their heirs and descendants, renounced all their estate and property to the founder and his associates as a free gift and donation for the benefit of the community and bound themselves and their heirs to make free renunciation thereof and to leave the same at the disposal of the superintendents of the community as though they were never possessed thereof, and also providing that such officers should be under no obligation to account for the property, but that it should be in the discretion of the superintendent to determine whether any, and, if any, what, allowance should be made to a withdrawing member or his representative as a donation, the property was held under a joint tenancy with the right of survivorship, and hence the heirs of the founder had no standing to assert a dissolution of the society and claim a share of its assets on the theory of a resulting trust.

[Ed. Note.—For other cases, see Associations, Cent. Dig. §§ 19-25; Dec. Dig. § 15.*]

2. TRUSTS (§ 63¾*)—RESULTING TRUST—GIFT.

Where the founder of a socialistic community made donations to it without any intent that any beneficial interest therein should be enjoyed by him or his heirs or other members of the society except on conditions provided for the community's enjoyment of the legal estate, no resulting trust arose in favor of his heirs with reference to such contributions on the subsequent termination of the society.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 91, 92, 98, 99, 100; Dec. Dig. § 63¾.*]

In Equity. Bill by Ada J. Everitt and another against John S. Duss and another for discovery and accounting. Bill dismissed.

John Cadwallader, Jr., of Philadelphia, Pa., Franklin T. Nevin, of Pittsburgh, Pa., and Charles E. S. Simpson, for plaintiffs.

D. T. Watson, of Pittsburgh, Pa., Agnew Hice, of Beaver, Pa., and John M. Freeman and Harry F. Stambaugh, both of Pittsburgh, Pa., for defendants.

ORR, District Judge. The plaintiffs by their bill assert a dissolution of the Harmony Society and a right to a share of its assets by way of resulting trust as heirs of George Rapp, whom they aver to have been a donor to the society. They seek discovery and accounting from the defendants, alleged to be former and present trustees, and ask appointment of a receiver pending distribution.

The history of the society, as stated in the bill, does not differ very materially from the actual history as recited and defined in decisions of the Supreme Court of Pennsylvania and the Supreme Court of the United States. Schriber v. Rapp, 5 Watts (Pa.) 351, 30 Am. Dec. 327; Baker v. Nachtrieb, 19 How. 126, 15 L. Ed. 528; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; and Schwartz v. Duss, 187 U. S. 8, 23 Sup. Ct. 4, 47 L. Ed. 53. The government of the society and the relative rights of its members were

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

defined by a number of written contracts from time to time executed by all its members, of which agreements the most material have been construed in one or more of the cases referred to.

It is admitted that George Rapp was born in 1757, came to the United States in 1803 or 1804, and died August 7, 1847, at Economy, Beaver county, Pa., leaving to survive him one daughter, Rosina Rapp, who died unmarried and without issue in 1849, and one granddaughter, Gertrude Rapp, who was the daughter of a deceased son, John Rapp, and who died unmarried and without issue in 1889. It is charged in the bill that both Rosina and Gertrude Rapp died intestate. Their intestacy is denied by the answer. A consideration of the evidence on this point is necessary.

The averment that plaintiffs are the next of kin of George Rapp, as descendants of his uncle, John Rapp, is denied by the answer. On this point the evidence must be considered.

The answer denies the averment in the bill that George Rapp, with an intention to found a society on the principles of the Apostles, to have community of goods, to escape religious persecution, to enjoy and put in practice peculiar religious views based on the theory that the millenium was at hand, did induce a large number of persons to emigrate from Germany in 1805 and to settle with him upon land in Butler county, Pa. No evidence was offered touching these allegations, and therefore they need not be considered.

The averments that George Rapp purchased the Butler county land with his own money for the community, and that the funds necessary to acquire the property and to bring persons from Germany were supplied by George Rapp and a few others, were denied by the answer. As an attempt was made to prove the truth of these averments, the evidence in regard thereto must be considered.

The answer admits the averments of the bill: That the society numbered 421 members in 1814; 522 in 1827; 403 in 1834. That from that date the diminution was steady. That on May 12, 1903, when an agreement was entered into by all the members, there were living Christina Schoeneman Rall, Barbara Boesch, Franz Gillman, and Susie C. Duss, and that since then Christina Schoeneman Rall and Barbara Boesch have died.

The parties differ in their interpretation of the various agreements made by the society and of the declaration of trust by its trustees in several respects but especially in this: The plaintiffs contend that the instruments contemplate an existing society as a going concern, and make no provision for the devolution of the society's property in the event of dissolution, while defendants assert that by the very nature of the title and property conveyed and acquired thereunder devolution of the property was provided for therein.

The bill avers and the answer admits that the society was not formed for a religious, charitable, literary, or scientific purpose, and that it was never incorporated.

The bill avers, and the answer admits, the execution of an agreement dated April 11, 1894, by 17 persons, purporting to be at that time all the members of the society, authorizing the conveyance of

lands to a land company and the conveyance of such lands in pursuance of such authorization; the execution of an agreement dated February 13, 1897, signed by all the members at that time, being 10 in number, whereby the defendant John S. Duss was made the sole trustee; the execution of an agreement dated April 16, 1903, signed by all the members at that time, being 8 in number, whereby certain previous agreements were ratified and John S. Duss, the defendant, and Franz Gillman were made to constitute the board of elders of the society; and the execution of an agreement dated May 12, 1903, signed by all the members at that time, being 4 in number, whereby Susie C. Duss, the defendant, was appointed sole trustee of the society, as successor to said John S. Duss, who in said agreement appears to have resigned his trust on May 12, 1903, and as well his membership in the society.

The plaintiffs insist that by the death or withdrawal of all the members except Susie C. Duss the society became dissolved. The defendants assert that in 1905 those who were members at that time, having paid all the debts of the society, unanimously agreed to and did divide the possessions of the society among themselves and actually dissolved and terminated the society.

The thirteenth paragraph of the bill sets forth plaintiffs' theory and the reasons why they should be among those to be preferred in distribution of assets in the following words:

"That as to all those joining and contributing to the society subsequent to its foundation their claims cannot be regarded as donations in trust similar to those of George Rapp, inasmuch as such contributions as were made were made in the nature of payments to an existing society to enable such persons to become members and were made in return for all the advantages of membership, including the supply of all their spiritual and temporal needs for their entire lives. That the contributions of George Rapp were donations in the strict sense, not given for a valuable consideration, but as a voluntary disposition to found the society. That he used his own means to purchase a site for the society before it had any existence and expended all his energy and resources in the great undertaking of inducing sufficient persons to cross the ocean to form a community and accept his teachings, and that without him the society would never have come into being."

The answer and amended answer specifically deny those averments.

The defendant John S. Duss, answering for himself, avers that he withdrew from the society in 1903, and has never since been a member thereof.

To place the discussion of the contention of the plaintiffs within narrow limits, it is observed: (a) That plaintiffs claim property of the Harmony Society as it was at and before the time of dissolution; (b) that their title to said property is by way of "resulting trust," because (1) they are heirs of George Rapp and as such entitled under the intestate laws of Pennsylvania, and because (2) George Rapp was the donor of property as to which the resulting trust exists. Taking these subdivisions in their inverse order, attention may first be given to the evidence that George Rapp was the donor of property. Plaintiffs claim that this has been proven by parol evidence and by the agreements entered into by the members of the society as set up in and attached to the bill and answer. The only witness called on

this point was Dr. John A. Bole, a teacher in the Eastern District High School, who in the summer of 1902 spent some time at or near the home of the society, and from his researches there prepared a work of 176 pages, entitled "The Harmony Society—a Chapter in German American Culture History." He testified that his work contained the statement "that George Rapp had brought with him two thousand gulden of his own." There is no statement in the book, so far as appears from the evidence, that George Rapp invested that money in the Butler county lands, and that such was the fact appears to have been inferred by the witness. The evidence shows that 2,000 gulden were approximately of the value of $800. The passport issued to George Rapp by the authorities of his native town is the source of Mr. Bole's information. It was produced by the defendants. It is dated April 7, 1804, and recites the resolution of George Rapp with his wife and children to emigrate to America, asserts his legitimate birth, good behavior, freedom from bondage, and his possession of property amounting to 2,000 gulden. It does not appear anywhere in the case what was done with the $800; whether or not he used any of it for the transportation of himself, or family, or friends.

[1] The written evidence relied upon is found in various agreements, signed by George Rapp and the other members, as for example, in article 1 of the agreement of 1805, which is as follows.:

"Article 1. We, the subscribers, on our part and on the part of our heirs and descendants, deliver up, renounce and remit all our estate and property consisting of cash, land and chattels, or whatever it may be, to George Rapp and his associates, in Harmony, Butler county, Pennsylvania, as a free gift or donation, for the benefit and use of the community there, and bind ourselves on our part, as well as on the part of our heirs and descendants, to make free renunciation thereof, and to leave the same at the disposal of the superintendents of the community, as if we never had nor possessed it."

In the agreement of 1836 is the recital that restoration of property cannot be enforced with uniformity or fairness, inasmuch as the members in 1818 destroyed all records or respective contributions up to that time. The evidence does not substantiate the averments of the thirteenth paragraph of the bill "that the contributions of George Rapp were donations in the strict sense not given for a valuable consideration." The articles of agreement, however, fairly show that George Rapp made contributions to the society of "lands, goods, money or labor," but do not show the amount or character of his contributions. They show that as a member he had the same title and interest as every other member. The use of the expression in the various agreements: "George Rapp and his associates"; "George Rapp and his association"; "the Association of Harmony"; "Community of George Rapp and his association"; "Harmony Society"— were used interchangeably without any other significance than to identify the community of which George Rapp and the other signers were members. That George Rapp may have been the spiritual head of the community gave him no rights of property greater than other members possessed. His appointment as successor to Frederick Rapp, who had held the legal title to the society's lands up until 1834, gave

him nothing but the legal title. In the agreement by which he was appointed he disclaimed "all personal interest other than that of a member of said society in the present resources or future earnings of the society." Such disclaimer by one now alleged to have borne some special relation to the members of the community and to have possessed some superior interest in the community's property, being a declaration against his interest, is entitled to great weight in the consideration of the questions before the court.

Again, George Rapp signed the agreement of 1836, of which the following is article 2:

"All the property of the society, real, personal and mixed, in law or equity, and howsoever contributed or acquired, shall be deemed now and forever joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in lands, goods, money or labor; and the same rule shall apply to all future contributions whatever they may be."

It is clear therefore that George Rapp in his lifetime, after the execution of those agreements, could not assert an interest in the community property greater than that of any other member. Had he voluntarily withdrawn from the society, he could not have demanded an account, nor could his representatives in case of his death, because he had covenanted by article 3 of the agreement of 1836, as follows:

"Should any individual withdraw from the society, or depart this life, neither he, in the one case, nor his representatives in the other, shall be entitled to demand an account of said contributions, whether in land, goods, money or labor, or to claim anything from the society as matter of right. But it shall be left altogether to the discretion of the superintendent to decide whether any, and if any, what allowance shall be made to such member or his representatives as a donation."

It is too late, in view of the decisions above referred to, for the court to adopt a contrary opinion of the relations of the members to the Harmony Society.

The plaintiffs, however, failing to give full effect to the emphatic pronouncement by the agreements of what Blackstone called the "grand incident of joint estates, viz., the doctrine of survivorship," insist that the contracts contemplated an existing society and were not intended to limit rights in the property after dissolution. It is true the contracts contain no suggestion that the society should cease to exist, but it may be fairly presumed that the frailty and temporary character of human institutions, not formed for any "religious, charitable, literary or scientific purpose," was in the minds of the parties from the care and language used to deprive the individual from further title to the common property except as an actual member of the community. The individual "finally and irrevocably parted" with his former contributions. All the property became "now and forever joint and indivisible stock." The society was exempted from liability to account. There does not seem to be anything from which it may be inferred that the individuals granted only a limited estate, that they retained reversionary rights, that there was a resulting trust. On the contrary, the agreements expressly negative such deductions.

The right of survivorship incident to joint tenancy may still exist in Pennsylvania when expressly provided for by deed or will or when it arises by necessary implication. Sturm v. Sawyer, 2 Pa. Super. Ct. 254, 256. With this case and the authorities therein cited and with the cases cited at the beginning of this opinion, the proposition that the Harmony Society, and its principle of survivorship, were against the policy of the law, is at extreme variance.

[2] Nor is there substance in plaintiffs' contention that there is a resulting trust in their favor with respect to the donations or contributions made by George Rapp; because no intent on his part appears, or can be inferred, that any beneficial interest therein was to be enjoyed by him or by his heirs or by others in any manner for any time or upon any conditions different from the enjoyment of the legal estate. As we have seen, his own declaration of his intent is in conformity with this view. There is absolutely nothing in the evidence to warrant an inference that at any earlier time he had any intent different from that he so clearly set forth in the agreements above referred to. Plaintiffs, however, insist that absence of consideration for the donations clearly appears, and that therefore a resulting trust arose under the subdivision (Bispham's Equity, § 79 [4]) "when a conveyance is made without any consideration and it appears from circumstances that the grantee was not intended to take beneficially." But there was a consideration in that George Rapp was to have an interest as a member of the community in the "land, goods, money or labor" contributed or to be contributed by others. If there were no consideration that would not of itself create a resulting trust, because with absence of consideration there must be coupled an appearance from "circumstances that the grantee was not intended to take beneficially." Having reached the conclusions that George Rapp had no other interest in the property of the society than any other member thereof, that there was incident to membership in said society a right of survivorship, that such right of survivorship was not against the policy of the law, and that there is no resulting trust in favor of the heirs or next of kin of George Rapp, there remains little for further consideration.

The evidence fairly establishes the fact that the plaintiffs are the next of kin of George Rapp as averred in the bill. Yet, even if there had been a resulting trust with respect to the Rapp donations or contributions, the plaintiffs would have no right thereto. Whatever estate George Rapp possessed passed by the intestate laws of Pennsylvania on his death to his daughter Rosina Rapp and his granddaughter (daughter of a son) Gertrude Rapp. Whatever estate the said Rosina Rapp possessed passed by the same laws on her death in 1849 to her niece, the said Gertrude Rapp. The latter died in 1889, and by her last will and testament duly probated she bequeathed and devised in language which could not be more comprehensive, all her estate, rights, and property of every kind, real and personal, to the trustee of the Harmony Society, and expressed her desire that the same should "go to and be enjoyed by those who are the members of the said Harmony Society and who survive me, and be for their joint and common

use and benefit and that of their heirs and assigns forever." It needs no citation of authorities to prove that "a resulting trust" is a subject of descent and devise. The right to enforce it may be postponed, but such postponement cannot suspend the title to it. If it ever existed in this case, it must have originated at the time George Rapp made his donations or contributions. If it existed, it passed by act of law and by will through successive stages until it became part of the common property of the society and acquired all the incidents of such common property.

There is a suggestion on the part of the plaintiffs that the defendants have acted in bad faith with respect to the society and its property, but evidence is lacking to support it. The fact that new members were not admitted to the society is nothing in the absence of evidence that applications for membership were made or presented. That membership was not desirable may be accounted for by the facts that there were internal dissensions, that some members withdrew from the society, that it was commonly believed that the society was not in sound financial condition.

The society was engaged in various manufacturing enterprises in addition to the improvement and cultivation of large tracts of land. It was the principal partner in a savings bank and was a large holder of the securities of the Pittsburgh, Chartiers & Youghiogheny Railroad. Large sums were owing various creditors. The annual loss of operation was over $100,000. It is not necessary to detail the various conditions threatening the total loss of all the society's assets and the various steps taken by the defendant John S. Duss, with the help of others, for the funding and payment of the indebtedness, which resulted in saving to the members some of the property which they had accumulated by their joint labor.

The withdrawal of the defendant John S. Duss from membership in 1903 seems to have been in conformity with the rules of the society. The agreement of dissolution entered into in 1905, between the defendant Susie C. Duss and the other members of the society, does not seem to have been contrary to law or to the rules of the society. The remaining members were jointly the owners of all the community property. What they jointly owned they could distribute in severalty.

The bill must be dismissed, at the cost of the plaintiffs. Let a decree be drawn.